FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CARGILL GLOBAL TRADING,<br><br>                              Plaintiff,<br><br>                    v.<br><br>APPLIED DEVELOPMENT COMPANY,<br>ESSEX & SUSSEX ASSOCIATES, L.P.,<br>APPLIED SENIOR LIVING<br>CORPORATION, *ET AL.,*<br><br>                         Defendants. | :<br>:<br>:<br>:<br>:<br>:   **OPINION**<br>:<br>:   Civ. No. 03-5920 (WHW)<br>:<br>:<br>:<br>:<br>:<br>: |

**<u>Walls, Senior District Judge</u>**

Defendant, Essex & Sussex Associates, L.P. ("Essex"), obtained a mortgage from

Berkshire Mortgage Finance Bethesda Limited Partnership ("Berkshire") to finance an

independent living rental facility for senior citizens.  The mortgage note, backed by a security

ultimately purchased by plaintiff, Cargill Global Trading Company ("Cargill"), contained a rider

limiting Essex's right to pay the loan before December 31, 2006 (the "prepayment restriction").

It also contained a provision permitting the Department of Housing and Urban Development

("HUD"), which insured the loan, to override the prepayment restriction to avoid a mortgage

insurance claim in the event of a default.

In 2003, Essex defaulted on the loan and HUD overrode the prepayment restriction.

Essex prepaid the balance of the loan and, released from the loan's restrictive terms, converted

the property to condominiums – a move which turned the facility into a successful and lucrative

project.  Because Essex prepaid the loan, Cargill did not receive the full amount of interest that it had expected under the loan's terms, to the tune of about $4 million.

Cargill now sues Essex for breach of contract, conversion, and tortious interference with the security, and Applied Development Company ("ADC") for conversion and tortious interference with the security and the loan.  Cargill also asserts that Applied Senior Living Corporation ("ASLC"), Essex's general partner, is liable to the full extent of Essex's liability. The success of all three claims turns on whether any of the defendants behaved wrongfully, maliciously, or in bad faith by seeking the override from HUD instead of paying Cargill a premium in exchange for Cargill's consent to prepayment.

A bench trial to resolve this controversy was held intermittently between September 1, 2009 and October 23, 2009.  After the conclusion of the trial, Cargill and Essex submitted proposed findings of fact and conclusions of law.  The Court has reviewed these proposals and compared them to the Court's recollection, notes, and trial transcripts.  Most of the proposed findings submitted by the parties are irrelevant to the issues immediately before the Court and need not be addressed.  The Court makes only those findings and draws only those conclusions that are relevant to, and supportive of, the causes of action at issue.

In short, this opinion finds those facts and draws those legal conclusions that are responsive to, and answer, the following question:  Did Cargill prove, by a preponderance of the believable evidence, that (1) Essex breached a contract to which Cargill was a third party beneficiary; (2) Essex or ADC tortiously interfered with a security between Cargill and Berkshire or a loan between Essex and Berkshire; or (3) Essex or ADC is liable for conversion of Cargill's property?  Defendants assert various defenses such as the Knorr-Pennington Doctrine, and argue that ADC is not a legal entity and not subject to liability for any of the above claims.

2

Because the Court finds that Cargill has failed to prove any of its causes of action by a preponderance of the believable evidence, the Court need not reach defendants' defenses.

The Court's findings and conclusions do not merely reflect the trial transcript. Rather, the Court has fulfilled its duties as factfinder by evaluating the credibility of each witness and all evidence. The Court does not, and is not obliged to, accept all testimony as fact. Instead, the Court finds only the following enumerated paragraphs to be the facts. To the extent that a numbered finding of fact is more properly characterized as a conclusion of law, it shall be deemed as such, and vice versa.

## FINDINGS OF FACT

### I.       The Parties

1.       Plaintiff Cargill is a corporation formed under the laws of the Cayman Islands, with a principal place of business in Minnesota. (Final Pretrial Order at 5 (Stipulation of Facts) ¶ 2, June 3, 2009 ("Stipulation of Facts").)

2.       Defendant Essex is a limited partnership organized under the laws of New Jersey, whose partners are citizens of states other than Minnesota. (Stipulation of Facts ¶ 1.)

3.       Defendant ASLC is the general partner of Essex. (Stipulation of Facts ¶ 3.) Allen F. Goldman was, at all times relevant to this action, an officer of ASLC. (Stipulation of Facts ¶ 4.)

4.       Defendant ADC is a residential development company. (Tr. Sept. 2, 2009 at 8:13-17.) Goldman worked for ADC between 1991 and 2004 on a variety of real estate development projects in New Jersey. (Tr. Sept. 8, 2009 at 83:7-24; 84:8-16.)

**II.    Acquisition of the Essex & Sussex Property and the HUD loan.**

5.      The Essex and Sussex Property (the "Property"), which is at the heart of this lawsuit, was built in 1914 and operated as a beachfront hotel until 1985.  The hotel was unoccupied for approximately six years, until Goldman learned about it in 1991, at which time the Property was lying fallow.  (Tr. Sept. 8, 2009 at 84:19-85:11.)

6.      Essex purchased the Property in 1993, with plans to develop it as a residence for independent seniors.  (Stipulation of Facts ¶ 5.)  The Property had already been about 60% redeveloped, and then abandoned.  When Essex purchased it, Essex made a formal application to the Borough of Spring Lake (the "Borough") to receive a zoning variance allowing it to develop and operate the Property as an independent living residence for seniors.  Community members bitterly opposed the variance application, but, after extensive litigation, Essex won the right to go forward with the project in 1999.  (Tr. Sept. 8, 2009 at 85:25-87:23.)

7.      Based on Essex's agreement with the Borough, Essex was permitted to rent apartments subject to the following restrictions:

> a.  That no more than 168 living units, each unit consisting of no more than two bedrooms, a bathroom, and a living room with limited kitchen facilities, shall be located or occupied on the premises.
> b.  That no individual less that [sic] 62 years of age shall reside on the premises, except for the spouse of a resident who is 62 years of age or older.
> c.  That no kitchen facilities shall be installed or permitted to be installed by Essex and Sussex in any of the living units located on the premises except for a sink, a non-convection microwave oven, and a refrigerator which has a volume that does not exceed eight (8) cubic feet.  All such kitchen facilities shall be installed by Essex and Sussex.  The installation of stove tops and/or stove burners is specifically prohibited in any of the living units.  No clothes washers or dryers shall be installed or permitted to be installed in any living unit except the two-bedroom units and the one penthouse unit permitted on the premises. . . .
> j.  Essex and Sussex shall not provide health care services on the premises of the Essex and Sussex Hotel.

(Tr. Sept. 8, 2009 at 90:16-23; Def.'s Ex. 140 at LCS 00470-00475.)  Although these requirements were quite restrictive, Essex agreed to them voluntarily and believed that it would be able to market the Property successfully despite them.  (Tr. Sept. 8, 2009 at 96:14-98:7.)

8.      To finance the development of the Property, on November 7, 2000, Essex closed on a forty-year, $24,360,100.00, 7.83% non-recourse mortgage loan made by Berkshire. (Stipulation of Facts ¶¶ 8, 14.)  The loan was secured by a mortgage on the Property and insured by HUD.  (Stipulation of Facts ¶¶ 8, 10.)  Catherine Pharis, a Vice President of Berkshire, was Essex's principal contact at Berkshire.  (Stipulation of Facts ¶ 9.)

9.      The loan contract limited Essex's right to pay off its debt before December 2011. The contract contained a prepayment restriction, which provided that the loan could not be prepaid at all before December 2006.  If Essex chose to prepay the loan at any time between December 2006 and December 2011, it would have to pay a premium to Cargill, representing the lost future income from the monthly loan payments.  (Pl.'s Ex. 10.)  The general purpose of the prepayment restriction was to encourage investors to invest by locking in the interest rate stated in the contract for a certain period of time.  Because Essex knew that Berkshire would obtain funding for the loan through the sale of a security backed by the loan, Cargill, the eventual investor in that security, was a third party beneficiary of the prepayment restriction of the loan contract.  (Letter Order Granting Mot. for Partial Summ. J. 4-5, June 19, 2008.)

10.     The loan contract offers an override exception to the prepayment restriction:

> Notwithstanding any prepayment prohibition imposed and/or penalty required by the Note prior to December 1, 2006, the indebtedness may be prepaid in part or in full without the consent of the Holder and without prepayment penalty if the Secretary of the Department of Housing and Urban Development ("HUD") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interest of the Federal Government.

(Pl.'s Ex. 10.)  The contract did not require Essex to attempt to negotiate with the investor before petitioning HUD for a release from the prepayment restriction.

11.      Berkshire financed the loan through the issuance of a mortgage-backed security (the "Security"), pursuant to a program administered by the Government National Mortgage Association ("Ginnie Mae").  (Stipulation of Facts ¶ 11.)

12.      The terms of the Security were set forth in an accompanying prospectus.  The prospectus states that "[t]he mortgagor has the option to prepay the Mortgage on the terms described in the Annex."  (Def.'s Ex. 73 at CAR89.)  It further specifies that the mortgagor had an option to prepay if the owner of the Security agreed to waive the prepayment restriction in the loan and to permit prepayment:

> **Termination by Agreement**
> The pool arrangement may be terminated at any time prior to the maturity date of the Securities, provided that the Issuer and all holders of the outstanding Securities have entered into an agreement for such termination.  Upon formal notification with satisfactory evidence that all parties to the termination agreement have concurred, and return of the Securities to Ginnie Mae for cancellation, the guaranty will be terminated.

(Def.'s Ex. 73 at CAR00088.)

13.      The clear terms of the loan and Security provided Essex with two viable options for paying before December 2006, without incurring a penalty:  first, negotiation with the mortgagee;  second, seeking and receiving a HUD override of the prepayment restriction.  After the Security was issued, the terms of the loan were fixed.  At and after that time, Essex and Berkshire could not modify or waive any provisions of the loan without taking one of those options.  (Pl.'s Ex. 169 (Dep. of Bernald Malone at 118-119).)

14.      Cargill acquired the Security in November 2000.  (Stipulated Facts ¶ 12.) Matthew Koeppen, a portfolio manager at Cargill who managed mortgage-backed securities,

among other kinds of securities, made the decision to purchase and invest in the Security.  (Tr. Sept. 14, 2009 at 18:2-8; Def.'s Ex. 153 (Dep. of Matthew Koeppen at 22:24-23:2).)

15.    Before Koeppen made the decision to purchase the Security, he investigated the project, acquainting himself with all the key terms of the Security.  He also reviewed the prospectus, which contained the rider with the override provision.  He described the override provision as "a standard term in all Ginnie Mae project loan mortgage backed securities." (Tr. Sept. 14, 2009 at 18:12-17, 111:18-112:1, 112:13-113:6; Def.'s Ex. 153 (Dep. of Matthew Koeppen at 45:6-47:8; Koeppen Ex. 5)).)

16.    Koeppen also read a document called Mortgagee Letter 87-9 before deciding to purchase the Security.  The purpose of Mortgagee Letter 87-9 was to provide guidance to mortgagees by clearly stating "the terms under which [HUD] will consider prepayment lockout overrides."  (Def.'s Ex. 153 (Dep. of Beverly Miller at 21:11-22:1).)  The letter reads, in part:

> HUD would consider exercising an override of a mortgagee's prepayment lock-out and/or penalty provision only if:
>
> (1) The project mortgagor has defaulted and HUD has received notice of such default, as required by 24 CFR Section 207-256 (full Insurance cases) or Section 251:810 or 255:808 (coinsurance cases);
> (2) HUD determines that the project has been experiencing a net income deficiency, which has not been caused solely by management inadequacy or lack of owner interest, and which is of such a magnitude that the mortgagor is currently unable to make required debt service payments, pay all project operating expenses and fund all required HUD reserves;
> (3) HUD finds there is a reasonable likelihood that the mortgagor can arrange to refinance the defaulted loan at a lower interest rate or otherwise reduce the debt service payments through partial prepayment; and
> (4) HUD determines that refinancing the defaulted loan at a lower rate or partial prepayment is necessary to restore the project to a financially viable condition and to avoid an insurance claim.

(Def.'s Ex. 153 (Dep. of Matthew Koeppen, Koeppen Ex. 4 at CAR00097).)  It is clear that Koeppen, who read this document, was specifically aware that HUD could waive any prepayment restriction in the Security.  (Def.'s Ex. 153 (Dep. of Matthew Koeppen at 26:8-27:9).)

17.     There is no documentary evidence to support Cargill's claim that the mortgagor was obligated, required, or directed to negotiate with the investor before asking HUD to override the prepayment restriction, or to inform the mortgagee that such a request had been made.  (Tr. Oct. 19, 2009 at 37:21-39:21, 42:19-25.)  Cargill has offered no convincing evidence to support its claim that industry standards and practices required Essex to negotiate with the investor before requesting a HUD override.

18.     Cargill relies almost exclusively on the testimony of Ann Hambly, the one-time head of a national lender/servicer of Ginnie Mae mortgage-backed securities, to support the existence of these industry standards and practices.  But Hambly testified that it was merely her intuition that usually mortgagors negotiate with mortgagees before seeking a HUD override, and that her intuition was based only on her "common sense."  (Tr. Oct. 19, 2009 at 38:6-39:21.)  Hambly further acknowledged that she had never been in a situation "where the borrower came to me as a servicer and said 'I want to break my lock.'"  (Tr. Oct. 19, 2009 at 44:6-8.)

19.     To summarize, Cargill was aware, at the time that it purchased the Security, that the prepayment restriction could be overridden by HUD.  Essex was not bound by industry standards and practices to negotiate with Cargill before asking HUD to override the prepayment restriction.  Essex, furthermore, was not required by contract or custom to notify Cargill that it was making its request to HUD.

20.     Cargill states that, "[a]lthough not expressly stated in a written HUD policy, and although it does not and, for practical reasons cannot, attempt to enforce such a requirement, HUD expects borrowers to reasonably attempt to obtain voluntary waivers of lockouts before requesting overrides.  This is because, if the borrower, lender and the investor agree to a prepayment prior the [sic] expiration of a lockout, there would be no need for HUD to override the lockout."  (Pl.'s Post-Trial Findings of Fact & Conclusions of Law ¶ 59.)

21.     Cargill has drawn an incorrect conclusion here.  Cargill reasonably asserts that HUD would have no need to override a prepayment restriction if the parties first agreed to override it themselves.  Cargill infers from this that HUD would expect a mortgagor to negotiate with a mortgagee, in an attempt to reach a compromise, before petitioning HUD.  This inference is unfounded.  A more rational understanding of the two mechanisms for overriding a prepayment restriction – agreement by the parties and HUD override – is that either option is sufficient but neither is necessary.  Just as an agreement by the parties would obviate action by HUD, so too would action by HUD obviate the need for an agreement by the parties.  Cargill has failed to prove that there was any industry standard or HUD expectation that a mortgagor would negotiate with a mortgagee before asking HUD for an override.

**III.     Development and Marketing of the Essex & Sussex Property**

22.     As a party to the loan contract, Essex had agreed to operate the Property as a Retirement Service Center, which would be marketed primarily to "individual and couples of 70 years of age and up who are no longer capable or not desirous of preparing their own meals." (Pl.'s Ex. 2 (HUD Notice 83-58) at 3.)  Essex expected that it would take approximately twenty months from the time of opening for occupancy until rental revenue would cover the cost of

operating expenses and debt service.  (Tr. Sept. 2, 2009 at 44:22-45:24; Def.'s Ex. 22 at E&S4165-66.)

23.     Essex hired experienced companies to develop, market, and advertise the Property.  Life Care Services ("LCS") developed the property as an independent living facility for elderly renters, providing management services.  (Tr. Sept. 8, 2009 at 104:18-105:7.)  Essex first hired ZA Consulting to market the Property.  When ZA Consulting disbanded, Essex replaced it with the Marketing Directors, Inc. ("MDI"), a New York consulting firm that specialized in leasing and sales efforts for residential developers.  (Stipulation of Facts ¶ 17.) Essex hired Sherman Advertising to advertise the rental of the property.  (Tr. Sept. 2, 2009 at 22:8-11, 106:13-19; Tr. Oct. 19. 2009 at 95:4-7.)  Essex also received assistance from Cahn Communications, a public relations company that helped design a public relations strategy and develop public relations initiatives for the Property.  (Tr. Sept. 2, 2009 at 22:12-23.)

24.     Initially, the pre-opening response to the Property was promising and interest was high.  The companies that Essex hired diligently fulfilled their obligations.  Advertisements were placed in the Asbury Park Press, the New York Times, the Bergen Record, and the Wall Street Journal, along with radio and television ads, outreach programs, open houses, etc. (Tr. Sept. 8, 2009 at 116:20-117:7; Pl.'s Ex. 44 at E&S 609-610; Def.'s Ex. 60 at E&S 617-620), leading to a large number of individuals interested in renting by 2001.  (Tr. Sept. 8, 2009 at 107:15-24, 117:10-12; Tr. Oct. 20, 2009 at 37:21-38:4.)  One hundred seventeen people paid substantial deposits as a good faith show of interest.  (Tr. Sept. 8. 2009 at 107:15-24.)  Essex ultimately spent nearly $1.3 million on marketing efforts.  (Def.'s Ex. 60 at E&S 609; Tr. Sept. 2, 2009 at 130:14-131:5.)

25.     However, after the September 11, 2001 attacks, and the economic downturn that occurred in late 2001, prospective renters began to show more interest in buying properties.  (Tr. Sept. 8, 2009 at 108:5-109:5.)  Many individuals who had put down deposits for rental units in the Property cancelled.  (Tr. Sept. 8, 2009 at 112:13-22.)  By Memorial Day 2002, the Property had been marketed for more than a year with only 13 leases signed.  Essex understood this as a sign that the Property was not being well received as a rental.  (Tr. Sept. 8, 2009 at 115:23-116:7.)

26.     In the spring of 2002, Essex attempted to expand the pool of prospective renters by lowering the minimum age of renters to 55, but the Borough did not authorize this.  Around this time, MDI informed Essex that prospective renters were looking to purchase units, rather than rent, an attitude consistent with a broad and contemporaneous change in thinking across the nation, due largely to the low interest rates available for mortgages.  Essex made no changes in the marketing effort at this time; MDI continued to market the Property as rental units throughout 2002.  (Pl.'s Ex. 23 at E&S3904-05; Tr. Oct. 19, 2009 at 140:23-141:8, 142:8-13.)

## IV.     The Property Begins to Fail, and Essex Seeks a HUD Override

27.     The Property opened for occupancy in May 2002, as an independent rental community for people aged 62 and older.  It consisted of 165 one bedroom and studio units, with an average monthly rent of $3,900.  (Stipulation of Facts ¶¶ 15-16; Tr. Sept. 2, 2009 at 45:25-46:2; Tr. Sept. 9, 2009 at 11:15-18.)  At the time of opening, about 10% of the units were occupied by tenants who had already applied and paid a deposit.  By December 13 of the same year, only 25% of units, or 42 out of 165 units, were occupied.  (Tr. Sept. 9, 2009 at 10:2-17:13; Tr. Oct. 19, 2009 at 98:5-11, 113:1-8.)  The Property required a minimum occupancy of 73%, or 120 units, to break even.  The Property was performing below expectations, leading to

"tremendous loss" and an inability to meet its expenses.  (Tr. Sept. 9, 2009 (Afternoon Session) at 79:21-25, 80:1-16.)  The Property was bleeding as much as $250,000 monthly.  (Tr. Sept. 9, 2009 at 22:20-23:15.)  Although Essex had anticipated that the Property would not be financially viable for about 20 months following the opening, the Property was being rented at a rate far below expectations, and it became clear to Essex that it would take much longer than 20 months to reach the point where the rental income covered the operating cost and debt servicing.  (Tr. Sept. 2, 2009 at 45:20-46:18; Def.'s Ex. 22 at E&S4165-66.)

28.     By October 11, 2002, Essex had begun to consider alternatives, such as converting the Property from rental to ownership.  (Tr. Sept. 2, 2009 at 101:22-102:2; Tr. Sept. 9 at 18:13-17.)  By October 30, 2002, Goldman decided that such a change was necessary, and asked MDI to develop a sales strategy and promotional materials.  (Tr. Sept. 2, 2009 at 105:19-106:24; Tr. Sept. 9, 2009 at 17;23-25; Tr. Oct. 20, 2009 at 4:13-17, 5:22-25.)  In November 2002, Goldman suspended advertising of the Property (Tr. Sept. 2, 2009 at 106:25-107:11; Tr. Sept. 9, 2009 at 17:14-18, 18:8-12), but MDI continued to attempt to lease units through the end of 2002, without success.  (Tr. Oct. 20, 2009 at 42:2-5, 42:13-14, 42:21-43:2.)

29.     In order to convert the Property from rental units to units for sale, Essex needed to secure an override of the prepayment restriction so that it could refinance the loan under different terms.  See supra ¶ 14. Essex first sought an override from HUD, which was already aware of the problems Essex faced in leasing the Property.  In response, HUD began requiring monthly accounting reports in June 2002, for review by HUD's Newark, New Jersey Multifamily Program Center (the "Newark Center").  (Def.'s Ex. 49; Tr. Oct. 20, 2009 at 57:16-58:8; Tr. Oct. 23, 2009 at 11:1-24.)  These monthly reports showed that the Property's operating expenses consistently exceeded its operating revenues.  (Tr. Oct. 20, 2009 60:3-14, 60:25-63:2, 64:19-

65:4, 67:17-24, 68:9-24, 86:24-87:16, and 88:22-91:4.)  The Newark Center's Director, Walter

Kreher, and his supervisor, Connie Loukatos, visited the Property to discuss Essex's difficulty in

meeting its occupancy projections.  (Tr. Oct. 23, 2009 at 10:24-11:8, 12:20-13:3, 13:11-16;

Def.'s Ex. 153 (Dep. of Beverly Miller at 13:11-17).)

       30.     Following this meeting, Goldman wrote to Loukatos and Kreher, requesting an

override of the prepayment restriction.  (Def.'s Ex. 60.)  Attached to his letter was a rental

projection for the Property, which Christopher Zirrith, Essex's CFO, had prepared.  The

projection, based on actual leasing results and anticipated expenses, predicted that the Property

would not be profitable before 2003, and forecast continued deficits of more than $200,000

monthly.  (Def.'s Ex. 60 at E&S623; Tr. Sept. 2, 2009 at 127:1-14; Tr. Oct. 20, 2009 at 76:17-

77:10.)  HUD denied the request.  (Def.'s Ex. 153 (Dep. of Beverly Miller at 36:19-37:16, 67:1-

69:13); Tr. Oct. 23, 2009 at 17:11-13.)

       31.     After receiving HUD's denial, Essex attempted to contact the investor in the

Security, but was as yet unaware of Cargill's identity.  Goldman called Catherine Pharis at

Berkshire, urging her to contact the investor on Essex's behalf.  (Tr. Sept. 2, 2009 at 136:18-

137:19, 142:4-12.)  Pharis attempted to initiate a discussion with the investor by calling contacts

at Prudential and Credit Suisse First Boston, but was unable to contact Cargill.  (Tr. Sept. 8, 2009

at 19:15-19; Def.'s Ex. 153 (Dep. of Catherine Pharis at 124:11-126:5).)

       32.     Essex continued to experience deficits in late 2002 and early 2003, forcing it to

seek and receive HUD approval for monetary releases from its Operating Deficit Reserve and

from a working capital escrow.  (Def.'s Ex. 66; Def.'s Ex. 82.)  The Operating Deficit Reserve

was exhausted in March 2003.  (Def.'s Ex. 90; Tr. Oct. 20, 2009 at 86:17-87:8.)

33.     Essex continued to consider converting the Property to for-sale units, and increased its attempts to get in touch with the investor.  Eventually, Goldman made contact with Karen Cady, an employee of Credit Suisse First Boston, who facilitated the buying and selling of mortgage-backed securities such as the one at issue here.  (Tr. Sept. 11, 2009 at 43:19-44:13, 57:17-23.)  Goldman telephoned Cady in March 2003, asking her for the identity of the investor.  Cady replied that she could not provide the identity of the investor, because the investor "prefer[red] to remain anonymous."  (Tr. Sept. 9, 2009 at 57:19-22, 58:12-24; Tr. Sept. 11, 2009 at 73:17-74:2, 75:7-9, 75:13-15.)  Cady suggested that Goldman provide her with financial information and proposals, which she would forward to the investor.  (Tr. Sept. 11, 2009 at 73:25-74:2, 74:22-75:6.)  Goldman submitted a letter, dated March 14, 2003, which Cady forwarded to Koeppen.  The letter included a history of the Property, the current rent roll, and the operating results, showing a cumulative deficit of over $3 million.  (Pl.'s Ex. 110B.)  Essex offered to pay a premium of $750,000 plus continued payment of above-market interest in exchange for release from the prepayment restriction.  (Pl.'s Ex. 110B at CAR01222-01223.)  Koeppen neither accepted nor rejected the offer, and did not make any counteroffer.  (Tr. Sept. 14, 2009 at 134:17-135:20.)

34.     After receiving Essex's proposal, Koeppen phoned Cady requesting that she ask Essex for more information.  Cady called Goldman, who was not available, and left a voice-mail message.  (Pl.'s Ex. 90; Tr. Sept. 11, 2009 at 60:21-61:20; Tr. Sept. 8, 2009 at 46:12-23.)  Goldman never returned Cady's call.  (Tr. Sept. 11, 2009 at 60:21-61:20.)

35.     On April 16, 2003, Berkshire notified Essex that it had failed to make its April mortgage payment.  (Def.'s Ex. 94; Tr. Sept. 8, 2009 at 49:9-11; Tr. Oct. 20, 2009 at 101:10-20.)  On April 28, 2003, Koeppen reached out directly to Essex.  (Tr. Sept. 8, 2009 at 49:12-14; Tr.

Sept. 14, 2009 at 36:13-37:1, 137:16-138:3.)  This was the first time that Essex was informed

that Cargill was the investor.  In this conversation, Goldman told Koeppen that Essex had made

the April payment to satisfy the delinquency, and that Koeppen should contact Berkshire with

any other questions.  (Tr. Sept. 14, 2009 at 38:2-8.)  Koeppen said nothing about Essex's earlier

negotiation attempt.  (Tr. Sept. 8, 2009 at 66:20-67:17; Tr. Sept. 9, 2009 at 62:6-14; Tr. Sept. 14,

2009 at 145:7-15.)

   36. On May 19, 2003, Berkshire notified Essex that it had missed its May mortgage

payment.  (Def.'s Ex. 103; Tr. Oct. 20, 2009 at 101:21-102:5.)  Berkshire gave Essex a notice of

default, dated June 2, 2003.  (Def.'s Ex. 105; Tr. Sept. 9, 2009 at 66:21-23; Tr. Oct. 20, 2009 at

102:6-16.)  On June 4, 2003, Essex informed HUD that Berkshire had declared it to be in default.

   37. On June 20, 2003, HUD Office of Asset Management Director Miller notified

Loukatos and Kreher that Essex's request for an override of the prepayment restriction was

approved.  (Def.'s Ex. 110; Tr. Oct. 23, 2009 at 21:8-10; Def.'s Ex. 153 (Dep. of Beverly Miller

at 95:22-96:3).)  HUD notified Pharis at Berkshire that it had overridden the prepayment

restriction on June 23, 2003.  (Def.'s Ex. 112; Tr. Sept. 9, 2009 at 67:2-3; Tr. Oct. 23, 2009 at

21:13-22:1.)  The next day, Berkshire notified Cargill that HUD had overridden the prepayment

restriction, and that Essex was now allowed to prepay the loan.  (Def.'s Ex. 133; Tr. Sept. 15,

2009 at 32:23-33:8.)

   38. Essex prepaid the loan in June 2003 without obtaining Cargill's consent.  (Pl.'s

Ex. 87; Tr. Sept. 8, 2009 at 70:11-13, 73:21-74:3.) The Security was then terminated.  (Tr. Sept.

8, 2009 at 70:11-17.)  As a result, Cargill lost the ability to sell the Security with a greater than

market interest rate for a premium.  (Tr. Sept. 15, 2009 at 38:7-43:24.)  Cargill received from

Essex only the net value of the Security – approximately $24.24 million – not its premium value

of approximately $29.42 million, which includes future interest payments.  (Tr. Sept. 14, 2009 at

84:16-85:21; Pl.'s Ex. 115A.)  If Cargill had held the Security, receiving interest payments from

Essex for the full term of the loan, it would have received an additional $5.18 million.  (Tr. Sept.

14, 2009 at 84:16-85:21.)  This amount represents the total amount of money that Cargill would have

received in periodic interest payments over time.  Discounted to reflect the time value of money, the

present value on June 23, 2003 would have been $4.77 million.  (Tr. Sept. 14, 2009 at 105:10-17.)


## CONCLUSIONS OF LAW

When this lawsuit was first begun seven years ago, Cargill sought recovery against ADC,

Essex, and HUD on five grounds.   Cargill sought a declaratory judgment that HUD's override of

the prepayment restriction was void as arbitrary and capricious.  (Compl., Dec. 12, 2003.)  HUD

moved to dismiss that claim, which motion was granted on January 5, 2005.  (Op., Jan. 5, 2005.)

Cargill also asserted claims of conversion, unjust enrichment, breach of the duties of good faith

and fair dealing, and tortious interference with contract against Essex and ADC.  (Compl.)

Those defendants moved to dismiss.  On January 18, 2005, this Court granted the motion with

regard to the unjust enrichment claim and, as to ADC only, the breach of good faith and fair

dealing claim.  The motion to dismiss was denied as to all other claims.  (Op., Jan. 18, 2005.)

This Court also found, in a subsequent opinion resolving cross motions for summary judgment,

that Cargill was an intended third-party beneficiary of the loan contract between Essex and

Berkshire.  (Op., June 19, 2008.)

After seven years of litigation, Cargill has two remaining claims against both Essex and

ADC:  tortious interference with contract and conversion.  Cargill has a third viable claim only

against Essex, breach of contract.  Cargill has failed to prove any of these three claims against

the two defendants by a preponderance of the believable evidence.  As such, it will not be

16

necessary to address the question of whether ADC is a legal entity which may be held civilly liable for Essex's conduct.  It will also not be necessary to reach Essex's defenses, such as the assertion of immunity under the Knorr-Pennington Doctrine for any liability arising out of HUD's actions.

### 1. TORTIOUS INTERFERENCE WITH CONTRACT

Cargill asserts that Essex and ADC tortiously interfered with Cargill's Security.[1]  In New Jersey, a plaintiff must prove four elements to establish a tortious interference claim.  First, plaintiff must have a protected interest; second, defendant must have behaved with "malice" – that is, defendant must have intentionally interfered with that protected interest without justification; third, there must be a reasonable likelihood that the anticipated benefit from the protected interest would have been realized but for the interference; and fourth, economic damage must have resulted.  Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-52 (1989); C&J Colonial Realty, Inc. v. Poughkeepsie Sav. Bank, FSB, 355 N.J. Super. 444, 478 (App. Div. 2002).

#### A. Did Cargill have a protected interest?

In New Jersey, a protected interest "need not equate with that found in an enforceable contract," but will arise where the plaintiff had "'some reasonable expectation of economic advantage.'"  Printing Mart-Morristown, 116 N.J. at 751 (quoting Harris v. Perl, 41 N.J. 455, 462 (1964)).  Since a protected interest need not *rise to the level* of an enforceable contract, it stands to reason that an enforceable contract would suffice to establish a protected interest for purposes of this cause of action.  Cargill is a party to the Security and therefore had a protected interest.

---

[1] Cargill also asserts that ADC tortiously interfered with the loan contract to which Essex and Berkshire were parties.  Because Cargill has failed to state the basis for this complaint, failing even to assert the elements necessary to prove this claim, merely stating in a conclusory manner that ADC "wrongfully procured the breach of the Loan" (Pl.'s Post-Trial Findings of Fact & Conclusions of Law ¶ 35), it has not begun to meet its burden of proof.  No further analysis is necessary.

See id. ("A complaint must allege facts that show some protectable right – a prospective

economic or *contractual relationship*.") (emphasis added).

>   B.  *Did Essex intentionally and maliciously interfere?*

To be liable for tortious interference, a defendant's interference must have been both

intentional and malicious.  Interference is *intentional* when "'the actor desires to bring it about or

if he knows that the interference is certain or substantially certain to occur as a result of his

action.'"  Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003) (quoting Restatement

(Second) Torts, § 766A, comment e (1977)).  *Malice* means that "the interference was inflicted

. . . without justification or excuse."  Singer v. Beach Trading Co., 379 N.J. Super. 63, 82 (App.

Div. 2005) (quoting Mandel v. UBS/Paine Webber, Inc., 373 N.J.Super. 55, 79-80 (App. Div.

2004)).  The conduct must be both "'injurious and transgressive of generally accepted standards

of common morality or of law.' . . . The line clearly is drawn at conduct that is fraudulent,

dishonest, or illegal and thereby interferes with a competitor's economic advantage."  Lamorte

Burns & Co., Inc. v. Walters, 167 N.J. 285, 306-7 (2001) (quoting Harper-Lawrence, Inc. v.

United Merchants & Mfrs., Inc., 261 N.J. Super. 554, 568 (App. Div. 1993) *cert. denied*, 134

N.J. 478 (1993)).

A party's actions in its own interest and for its own financial benefit will not rise to the

level of malice.  See Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 451-

52 (App. Div. 1976).  Instead, a business-related explanation can justify a party's actions, so long

as the business-related explanation justifies not only the defendant's motive and purpose, but

also the means that it employed.  See Lamorte Burns & Co., at 307.  In Ideal Dairy Farms, Inc. v.

Farmland Dairy Farms, Inc., 282 N.J. Super. 140, 205 (App. Div. 1995), the Appellate Division

reversed a trial court's finding of tortious interference, noting that even if the defendant's

behavior had been motivated by spite and was directly aimed at hurting the plaintiff's business, this did not rise to the level of tortious interference because defendant had a "legitimate business reason to 'target' [the plaintiff] . . . regardless of any other motivation." Id. at 201. See also Cedar Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of New Jersey, 312 N.J. Super. 51, 67 (App. Div. 1998) ("At worst, the Bank was advancing its 'own interest and financial position,' which is not enough to establish tortious interference.").

     This Court finds that Essex's action was motivated by a genuine business-related concern.  Even if this were not the case, Essex still would not be liable for tortious interference with Cargill's contract.  Essex did not sabotage itself or resort to subterfuge or evasion.  All that Essex did was to provide truthful information to HUD about the state of its own business affairs. This cannot rise to the level of malice, even if the action was intended to interfere with a term in the Security.  See, e.g., East Penn Sanitation, Inc. v. Grinnell Haulers, Inc., 294 N.J. Super. 158, 180 (App. Div. 1996) (quoting Restatement (Second) of Torts § 772(a) (1977) ("One who intentionally causes a third person not to perform a contract . . . does not interfere improperly with the other's contracted relation, by giving the third person truthful information")); Liebe v. City Finance Co., 295 N.W.2d 16, 18 (Wis. Ct. App. 1980) ("[T]he transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract."); C.R. Bard, Inc. v. Wordtronics Corp., 235 N.J. Super. 168, 173-74 (Law Div. 1989) ("It is not improper to give truthful information to a customer about someone else's product, and this is so even if the purpose is to interfere with an existing or prospective contractual relationship.").

     Because Essex had a legitimate business reason to seek an override of the prepayment restriction – namely, halting and reversing the Property's tailspin – and because the substance of

Essex's interference was that Essex provided truthful information about its own business to HUD, Essex did not intentionally interfere without justification.

       *C.  Would Essex have realized the anticipated benefits of the Security, but for Essex's*
         *actions?*

Cargill must show that there is a reasonable probability that, but for Essex's actions, Cargill would have recovered the full benefit of the contract.  Cargill has failed to prove this, because this Court finds that if Essex had not requested and received an override of the prepayment restriction, the mortgage might very well have been subject to forfeiture, in which case Cargill would have lost far more than it did.  See, e.g., Pathfinder L.L.C. v. Luck, Civ. No. 04-1475, 2005 WL 1206848, at *12 (D.N.J. May 20, 2005) (granting the defendant's motion for summary judgment as to a tortious interference with contract claim because "the Court will not speculate on whether Pathfinder would have ever received economic benefit from AB Mazeikiu Nafta in the future.  If anything, the facts indicate that their relationship was steadily deteriorating.").  At the time it asked HUD to override the prepayment restriction, Essex was in genuine distress.  The Property's operating costs were continuously higher than its income, and at least one month's payment to Berkshire was missed.  Indeed, HUD's grant of Essex's request for an override of the prepayment restriction suggests that HUD, too, found the Property to be in distress and in danger of forfeiture.

Although Cargill has depicted a conspiracy scenario in which Essex was disingenuously sabotaging its own efforts to market the property, in order to cause HUD to grant an unwarranted override, the Court does not credit these allegations.  To the contrary, the Court finds it more probable that Essex's actions had the effect of safeguarding the Property's continuing viability and preserving for Cargill most of the value of the Security.

Cargill proposes that, but for Essex's tortious lobbying of HUD, Essex would instead have approached Cargill and negotiated a premium payment in exchange for release from the prepayment restriction. The Court finds that such an argument is purely speculative and cannot establish causation. See Reynolds v. Gonzalez, 172 N.J. 266, 284 (2002) (quoting W. Page Keeton et. al., Prosser & Keeton on the Law of Torts, § 41, at 269 (5th ed. 1984)) ("'The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'"). This argument is based on too many groundless assumptions – that Cargill would have engaged in negotiations (which Cargill never did, as Cargill never discussed Essex's offer with Essex), that the two parties would have achieved a compromise, and that these negotiations would conclude in time to prevent forfeiture. Cargill has failed to prove that, but for Essex's actions, Cargill's protected interest in the full term of above-market interest would have been realized.

### D. Did Cargill's economic damages result from Essex's interference?

The final element of a tortious interference with contract claim addresses whether a defendant's malicious interference with a plaintiff's contract caused the plaintiff to suffer economic damages. As discussed, it is clear that Cargill did not receive the full amount of interest promised under the terms of the Security. The present value on June 23, 2003 of these future interest payments was $4.77 million. (Tr. Sept. 14, 2009, at 103-106.) Although Cargill's contractual expectations were not fully realized, it would be improper to find that its disappointed hopes "resulted from" Essex's successful campaign to HUD. Rather, because of

Essex's lobbying, Essex was able to get out of the restrictive loan and pay the outstanding balance to Cargill.  If Essex had not received HUD's override, it may well have forfeited, resulting in a possible loss to Cargill of the full or substantial value of the Security – which, in June 2003, amounted to $29,415,898.00.  It is possible, then, that Essex's interference saved Cargill as much as $24,642,328.56 (indeed, had the loan gone into forfeiture, and had Cargill lost almost $25 million, the parties might be in the same stage of litigation in which they find themselves today – only in that case the cause of action would be Essex's failure to mitigate damages by seeking an override from HUD).  Whether Essex's actions cost Cargill or benefited Cargill is pure conjecture.  What might have been is, in this case, anyone's guess.  Since causation is a matter of probability, not possibility, and since speculation cannot replace evidence, this Court finds that Cargill has failed to prove this fourth element of tortious interference with contract: that Cargill's loss was a result of Essex's interference.  See Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 75 (3d Cir. 1996) (quoting the Restatement (Second) of Torts § 433B (1965)).

*     *     *

In conclusion, Cargill has not proved by a preponderance of the believable evidence that Essex interfered with Cargill's contract without justification, or that, but for such interference, Cargill would have received its full expectations under the contract.  Cargill has failed to meet its burden to demonstrate all four elements of this cause of action.

### 2.  CONVERSION

Under New Jersey law, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the

alteration of their condition or the exclusion of an owner's rights." Barco Auto Leasing Corp. v. Hold, 228 N.J. Super. 77, 83 (App. Div. 1988) (internal citations omitted).  While originally intended to protect title to chattels, conversion today may be applied to money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and it is capable of misuse in a way that would deprive the plaintiff of its benefit. See Besherer v. Swisher, 3 N.J.L. 748 (N.J. 1811); Hirsch v. Phily, 4 N.J. 408, 416 (1951).  Such application has been restricted in New Jersey, however, to prevent breach of contract claims from turning into tort claims.  See Chi. Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 454 (App. Div. 2009); Advanced Enters. Recycling, Inc. v. Bercaw, 376 N.J. Super. 153, 161 (App. Div. 2005).  Only where there is an obligation to return "the identical money" will an action for conversion lie – it does not lie where there is merely a debtor/creditor relationship.  See Advanced Enterprises Recyclinc, Inc. v. Bercaw, 376 N.J. Super. 153, 161 (App. Div. 2005); 18 Am. Jur. 2d *Conversion* § 8 (2003).

Here, Cargill argues that Essex wrongfully took and altered Cargill's property – the Security – depriving Cargill of the premium market value of that Security.  (Pl.'s Post-Trial Findings of Fact & Conclusions of Law, at 94 ¶¶ 48-50.)  Because Essex did nothing legally wrong – it neither sabotaged its marketing effort, nor behaved improperly by asking HUD to exercise its express contractual authority to override the prepayment restriction – Cargill has failed to make out a conversion claim.

### 3.  BREACH OF CONTRACT

Cargill argues that, as an intended third party beneficiary of the loan contract, it has standing to assert a claim against Essex for a breach of contract because Essex breached the

implied covenant of good faith and fair dealing.  Cargill has already established that it was an intended third party beneficiary of the prepayment restriction provision of the loan contract. (Op., June 19, 2008.)  In New Jersey, a third party beneficiary is entitled to sue for a breach of the contract intended to benefit him.  See N.J.S.A. 2A:15-2.

A breach of contract claim has four elements.  Plaintiff must prove that A) the parties entered into a contract that contained certain terms; B) the promisee satisfied the terms of the contract; C) the promisor failed to satisfy at least one term of the contract; and D) the breach caused the promisee to suffer a loss.  Nat'l Util. Serv., Inc. v. Chesapeake Corp., 45 F.Supp. 2d 438, 448 (D.N.J. 1999) (Walls, J.) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1235 at 269-271 (1990)).  The party bringing the action has the burden of establishing each element in order to establish breach of contract.  See Nolan v. Control Data Corp., 243 N.J. Super. 420, 438 (App. Div. 1990).

A.  *The parties entered into a contract which contained certain terms*

Cargill has established the existence of the loan contract between Essex and Berkshire, and that it was an intended third party beneficiary.

B.  *The promissee satisfied the terms of the contract*

Cargill's satisfaction of all the terms of the contract is not at issue.

C.  *The promisor failed to satisfy at least one term of the contract*

Cargill has not asserted that Essex violated any of the express contractual terms.  Indeed, HUD was expressly authorized to override the prepayment restriction, and no contractual term required Essex first to negotiate with Berkshire or Cargill.  Instead, Cargill asserts that Essex breached an implied covenant of good faith and fair dealing.

The implied covenant of good faith and fair dealing exists in every contract under New Jersey Law.  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc., 182 N.J. 210, 224 (2005) ("Every party to a contract, including one with an option provision, is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract.") (applying a duty to behave in good faith to real estate transactions); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1996) (applying the duty to commercial contracts).  As a third party beneficiary, Cargill is entitled to enforce the terms of the contract, including the implied covenant.  See County of Santa Clara v. Astra USA, Inc., 588 F.3d 1237, 1244 (9th Cir. 2009) ("Any intended beneficiary has the right to enforce the obligor's duty of performance."); Doe v. Pennsylvania Bd. of Probation & Parole, 513 F.3d 95, 106 (3d Cir. 2008) ("In addition to the parties to a contract, 'third-party beneficiaries' of the contract can also enforce its terms."); N.J.S.A. 2A:15-2.

To determine whether there has been a breach of this implied covenant, a court must consider the express language of the contract as well as any course of dealing between the parties.  23 Richard A. Lord, Williston on Contracts § 63:22 (4th ed. 2009).  New Jersey courts have discussed the implied covenant of good faith and fair dealing in the context of many different factual scenarios.  From these, three general principles can be gleaned.

First, the covenant is to be interpreted narrowly, lest it "become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements."  Brunswick Hills, 182 N.J. at 231 (quoting Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000)).

25

Second, a defendant can be liable for breach of the implied covenant even where it has not "violat[ed] an express term of a contract."  Sons of Thunder, Inc., 148 N.J. at 423.  But if a defendant acts in accordance with an express contractual term, he cannot be liable for breach of the implied covenant.  See Fields v. Thompson Printing Co., 363 F.3d 259, 271-72 (3d Cir. 2004) ("[W]here the terms of a contract are not specific, the implied covenant of good faith and fair dealing may fill in the gaps where necessary to give efficacy to the contract as written.  But where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language."); Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001) ("Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term.").

Third, a plaintiff's recovery for breach of the contract often hinges on its ability to prove that a defendant has acted with a bad motive or intention.  See Wilson, 168 N.J. at 251 ("[A]s stated by the United States Court of Appeals for the Seventh Circuit, '[c]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper.'").  A plaintiff must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties."  Williston on Contracts § 63:22 at 513-14.

New Jersey has adopted the definition of good faith found in the Uniform Commercial Code – "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  N.J.S.A. 12:A:2-103(1)(b).  In other words, "[g]ood faith conduct is conduct that does not 'violate community standards of decency, fairness or reasonableness.'"  Brunswick

Hills, 182 N.J. at 224 (quoting Wilson, 168 N.J. at 245).  The New Jersey Supreme Court has

held that evasions and subterfuges on the part of the defendant can suffice to establish a violation

of the implied covenant of good faith and fair dealing where there has been a "demonstrable

course of conduct, a series of evasions and delays, that lulled plaintiff into believing" that it

would get the benefit of the bargain.  Brunswick Hills, 182 N.J. at 231; see also Paterson 2003

LLC v. Maragliano, No. BER-C-24-05, 2005 WL 1010503, at *10 (N.J. Super. Ct. Ch. Div. Apr.

7, 2005) (noting defendant's pattern of neglect and evasion which led the Court to find a breach

of the implied covenant).

        Cargill has attempted to prove three separate categories of bad faith in support of its

claim that Essex breached the implied covenant.  First, Cargill has tried to show that Essex

sabotaged its rental effort and misled HUD "with the intent of depriving Cargill of its reasonable

and justified contract expectations."  (Pl.'s Post-Trial Findings of Fact & Conclusions of Law at

86 ¶ 25.)  The alleged purpose of this subterfuge was to convince HUD to grant an unnecessary

override of the prepayment restriction, so that Essex could redevelop the Property as more

lucrative condominiums.  Second, Cargill has tried to establish the existence of industry

standards and practices that a company in Essex's situation always negotiates with investors

*before* asking HUD to override a prepayment restriction.  The existence of such an industry

standard would be relevant to an inquiry into whether Essex violated the duty of good faith.  If

Essex had violated an industry standard, it would be much more likely that it had acted in bad

faith.  Third, Cargill alleges that Essex has engaged in subterfuge and evasion, rising to the level

of a breach of the implied covenant of good faith and fair dealing under New Jersey law.

i.    <u>Sabotage claim</u>

Cargill has charged, in sum and substance, that Essex sabotaged its rental efforts, creating a default situation so that it could request an override from HUD, rather than pay Cargill a hefty premium for permission to prepay the loan.  The evidence shows, however, that Essex hired respectable companies to develop and market the Property, and those companies put in a good faith effort to do so.  Essex has demonstrated that it mounted a good faith effort to rent the Property's units.  It marketed the Property in various ways, including extensive advertisements and support for walk-ins.  A PR firm was hired.  And the Property was developed in ways that would appeal to the senior community.  This Court agrees with Essex and finds that the Property's failure was a result at least in part of the nation's mood following the September 11th attacks, which led to dramatically lowered interest rates – making buying, rather than renting, especially appealing.  Cargill has produced no credible evidence that Essex forced the property to fail in order to get out of the restrictive loan terms.  The only thing that Cargill has proved that would tend to support this argument is that Cady from Berkshire called Goldman, and Goldman never returned the call.  This does not suffice to show bad faith, which requires more qualitative evidence than Cargill has provided.

ii.    <u>Industry standards and practices</u>

Cargill has also failed to prove that Essex had an obligation rooted in industry standards and practices to negotiate with Cargill before asking HUD to override the prepayment restriction. In attempting to prove that industry standards and practices required Essex to negotiate with Cargill before going to HUD, Cargill relied predominately on two sources of evidence:  the testimony of James Tahash and that of Ann Hambly.  Such does not suffice.  Tahash, a HUD employee, referenced in his deposition a handbook that his division put together, containing the

following statement: "Where these restrictions exist and the mortgagee does not waive its optional prepayment or lockout penalty provisions, HUD would consider exercising an override." (Pl.'s Ex. 169 (Dep. of James Tahash at 41, 45; Tahash Ex. 4 ¶ 22-11).) Although Tahash was not available at trial to explain this statement, the clear implication is that the mortgagee's refusal to negotiate is *one* scenario, but not necessarily the *only* scenario, in which HUD would override a prepayment restriction. Notably, Tahash does not say "*only* where the mortgagee does not waive … would HUD consider exercising an override."

   Hambly's testimony is similarly inconclusive. She stated roughly that she would expect a lender to approach an investor before going to HUD but that this expectation was based solely on her own common sense. She admitted that she had never been in such a situation and had no direct knowledge of whether lenders tend to approach investors before approaching HUD in similar situations.

   Essex, moreover, did attempt to get in touch with Cargill in order to negotiate an override of the prepayment restriction. Cargill responds that Essex's offer, $750,000, was so low that it was simply an attempt to forestall Cargill while Essex made its real bid for a HUD override. This explanation holds no water. Essex attempted to get in touch with Cargill and was, for a long time, unable to do so because Cargill preferred to remain anonymous. Eventually Essex did make contact with Cargill, at which time it made what this Court finds to be a genuine, good faith offer. This offer was far below the estimated $4 million value of the override, but it was a starting offer nonetheless. Cargill never responded to this offer, even after it was directly in touch with Essex – a fact which Cargill has not effectively explained. Although Cargill was perfectly within its rights to ignore the negotiation attempt, this Court does not accept Cargill's argument that Essex should have got in touch with it before seeking a HUD override. The facts

show that Essex *did* get in touch with Cargill around the same time that it approached HUD, and Cargill did not attempt to negotiate. The negotiations failed before they had even begun. There is no bad faith or unfair dealing here on Essex's part.

      iii.    <u>Subterfuge and evasion</u>

Finally, Cargill argues that subterfuge and evasion establish a breach of the implied covenant under New Jersey law. Because Essex did not inform Cargill that it was seeking a HUD override at the time it made its offer to Cargill, it allegedly engaged in evasion. But Cargill has failed to prove that Essex had any duty to disclose its interactions with HUD. Essex did not behave wrongfully by withholding information it had no duty to disclose.

Cargill also argues that Essex misled HUD by telling HUD that, without the override, there would be an insurance claim, which assertion led HUD to grant the override. Cargill claims that this was subterfuge, because Essex would never have let the Property fail to such an extent that an insurance claim would be necessary. However, to repeat the proved facts, the Property was in genuine distress when Essex sought the override from HUD, and Essex actually defaulted.

Cargill writes, "[a]s of December 17, 2002, given Essex's projections of substantial profits to be earned upon conversion of the Property to condominiums, its $8.1 million investment in the Property, and its knowledge that it could prepay the Loan with investor consent, there never was a legitimate threat of a claim on the insurance fund." (Pl.'s Post-Trial Findings of Fact & Conclusions of Law ¶ 159.) The all-important assumption here is that Cargill would have provided the much needed consent if Essex had only asked. But Essex did ask – did, in fact, attempt to negotiate a premium with Cargill – and Cargill never responded to this inquiry. This Court is unconvinced that, had Essex taken the approach urged by Cargill rather than

seeking an override from HUD, the parties would have successfully come to an agreement before the Property failed. While this Court believes that Essex would have acted to prevent an insurance claim, if HUD had denied the override petition, an insurance claim could nevertheless have actualized. This would probably have happened if Cargill had continued to be a rather unwilling negotiator. In petitioning HUD, Essex is guilty of no subterfuge, because an insurance claim might very well have resulted if Essex had continued its attempts to negotiate with Cargill instead of approaching HUD.

### D.   The breach caused the promisee to suffer a loss

Cargill certainly suffered a loss here: it lost both the opportunity to sell the Security at a premium and its right to receive the full amount of interest at the greater-than-market rate. But loss itself is not enough – Cargill must also prove that Essex caused it to suffer a loss. Here, Cargill argues that if Essex had not sought an override of the prepayment restriction from HUD, it would have paid Cargill a premium of $4 million for Cargill's permission to prepay the loan. This, according to Cargill, proves that Essex's action in approaching HUD caused Cargill to suffer an economic injury. This assertion is mere speculation. As stated, Essex did attempt to negotiate with Cargill, and Cargill did not respond to Essex's opening offer. Cargill has offered no believable evidence that it ever would have responded to Essex's offer. There is no way to know if the two parties would ever have come to an agreement. If they did not, and if Essex did not seek an override from HUD, Essex's operation would likely have gone out of business, possibly rendering it unable to repay any of the loan. In other words, rather than paying Cargill $24 million out of the $29 million to which Cargill was allegedly entitled, Essex might not have been able to pay anywhere near that amount. In this scenario, Cargill would have suffered a greater economic injury than the one that actualized. Cargill has not proved that Essex's actions

caused its loss, because it is just as likely that, but for Essex's actions, Cargill would have lost much more.

*      *      *

Cargill has failed to prove by a preponderance of the believable evidence either that Essex actually violated a duty of good faith and fair dealing or that Cargill's loss was caused by Essex's action.  Cargill has failed to prove the elements necessary to make out a claim for breach of the implied covenant of good faith and fair dealing.[2]

**CONCLUSION**

Cargill is understandably disappointed that it did not receive the full premium value of its above-rate Security.  But disappointment cannot a lawsuit win.  According to its burden of proof, Cargill has failed to demonstrate that its loss is the result of wrongdoing on the part of Essex, because it has not established the elements of breach of contract, tortious interference with contract, or the tort of conversion.  The Court enters judgment in favor of defendants.

April 21, 2010                                                        **s/William H. Walls**
                                                                      United States Senior District Judge

---

[2] Moreover, Cargill was fully aware of the terms of the Security when it acquired it.  Since Cargill, Berkshire, and Essex are all sophisticated parties, this Court considers that the interest rate on the loan and the cost of the Security incorporated the express risk that HUD might override the prepayment restriction.  Even if the price did not account for the risk, the risk was one voluntarily and knowingly assumed by Cargill.